# EXHIBIT B

INDEX NO. 711858/2023

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 2 of 51 PageID #: 12

RECEIVED NYSCEF: 06/08/2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

YUKTI ABROL,

                           Plaintiff,

     -against-

UBER TECHNOLOGIES, INC., ARUN NAGARAJAN,
AJEET GANGA, AND TRAVIS KALANICK,

                  Defendants.

Index No.:

**COMPLAINT**

*Jury Trial Demanded*

PLAINTIFF YUKTI ABROL, by and through her attorneys Goddard Law PLLC, whose

offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge

with respect to herself, and upon information and belief as to all other matters, as follows:

## PARTIES

1.     Plaintiff Yukti Abrol ("Plaintiff") is a female citizen of the United States who

currently resides in Queens, New York.

2.     Plaintiff was willing and able to perform her employment duties and obligations

and was qualified for the employment position she held at Defendant Uber Technologies, Inc.

("Defendant Uber").

3.     Upon information and belief, at all times relevant herein, Defendant Uber was and

is a corporation incorporated under the laws of Delaware. Upon information and belief, Defendant

Uber's headquarters are located at 175 Greenwich Street, New York, New York 10006.

4.     Defendant Uber was, at all relevant times herein, Plaintiff's "employer" within the

meaning of all applicable federal, state, and local laws, including, but not limited, to Title VII.

5.      Defendant Arun Nagarajan ("Defendant Nagarajan") is a Manager employed by Defendant Uber in New York, New York. At all relevant times, Defendant Nagarajan was Plaintiff's direct supervisor and/or had supervisory authority over Plaintiff.

6.      Defendant Ajeet Ganga ("Defendant Ganga") is a Manager employed by Defendant Uber in New York, New York. At all relevant times, Defendant Ganga was Plaintiff's direct supervisor and/or had supervisory authority over Plaintiff.

7.      Defendant Travis Kalanick ("Defendant CEO Kalanick") was the Chief Executive Officer employed by Defendant Uber in New York, New York, from 2010 to 2017. He remained on the board of directors until December 31, 2019.  At all relevant times, Defendant CEO Kalanick had supervisory authority over Plaintiff.

## PRELIMINARY STATEMENT

8.      In or around June 2017, Plaintiff, a highly-qualified software engineer, joined Defendant Uber as a Software Engineer 1 after an extensive interview process. Software Engineer 1 was a low level given Plaintiff's experience and education but, before she accepted Defendant Uber's job offer, Defendant Uber promised Plaintiff she would receive a high annual bonus and would be promoted to Software Engineer 2 within six months.

9.      Upon her hire, Plaintiff immediately noticed the male-dominated, fraternity like, misogynistic culture that pervaded at Defendant Uber. Plaintiff was one of few female employees in the NYC office (a number that has only decreased even while the office has grown), and, like her female colleagues, she was paid less than her male counterparts. Throughout her employment, Plaintiff was discriminated against by her male managers, Defendant Nagarajan and Defendant Ganga, which severely hurt her career and her mental and physical health.

2

Case 1:23-cv-05381-AMD-SJB  Document 1-3  Filed 07/14/23  Page 4 of 51 PageID #: 14

10.    Defendant Nagarajan sexually harassed Plaintiff when she first began her employment and subjected her to escalating gender and sexual orientation discrimination. Defendant Nagarajan micromanaged Plaintiff, nitpicking at her work and criticizing her in a way that he did not to male employees, making Plaintiff fear for her job. When Defendant Ganga joined Defendant Uber in 2018, he joined in on the discrimination, micromanaging Plaintiff and imposing absurd, unreasonable deadlines on Plaintiff's work that only added to her stress.

11.    Defendant Nagarajan and Defendant Ganga also discriminated against Plaintiff on the basis of her ethnicity as a Punjabi-speaking person from northern India. Both Defendant Nagarajan and Defendant Ganga are of a different ethnic group, hailing from southern India and speaking a different local language. Certain prejudices exist between and among the 705 recognized ethnicities in India. Some are remnants of the former caste system; others are based on skin color. Another is a general animus between the peoples of south India and north India, whom the southern Indians regard as conquerors of their land. Upon information and belief, these ethnic prejudices, in part, informed Defendant Nagarajan and Defendant Ganga's treatment of Plaintiff.

12.    Plaintiff experienced extreme anxiety at work due to Defendant Nagarajan's discrimination and harassment, which manifested in physical symptoms such as stomach problems. She sought treatment with a mental health professional. Starting in December 2017, Plaintiff began suffering from a physical disability related to nerve damage which caused extreme pain in her arms, neck, and back. As Plaintiff sought treatment and requested leave or reasonable accommodations to manage the pain, her requests were ignored or denied. When Defendant Uber was forced to allow the accommodations, Plaintiff's managers made her feel guilty for needing to seek treatment and made her fear for her job. Meanwhile, her male colleagues were given

3

ergonomic equipment without fuss and were regularly allowed to take leave without the same level of scrutiny.

13.     Despite the anxiety, physical pain, and unrelenting gender, disability, and ethnic discrimination from her male managers, Plaintiff still excelled in her role, to the particular praise of her colleagues and her assigned mentors.

14.     After reporting the discrimination to HR, Plaintiff faced retaliation. The impact of the discrimination on her salary and career progression was never rectified. She was eventually allowed to change teams and get away from her greatest harassers, but only after she escalated her concerns to the c-suite.

15.     In May 2019, Plaintiff was sexually harassed at a company event by former CEO Travis Kalanick.

16.     Defendant Uber announced restructuring in April 2020 that would put Plaintiff back on a team under Defendant Nagarajan. Triggered by the prospect of working again under the man who sexually harassed her and discriminated against her, Plaintiff suffered severe mental health symptoms. Plaintiff went on medical leave and was ultimately constructively terminated in September 2020.

## **FACTUAL BACKGROUND**

### **Plaintiff Establishes Herself as a Software Engineer**

17.     Plaintiff completed her Bachelors of Engineering and Masters of Engineering degrees in computer science in just four years. As an undergraduate at Stony Brook University, Plaintiff worked as a research assistant from 2011 to 2013, and as a software engineer at General Assembly from 2013 to 2014. While working on her Master's Degree at Cornell University in 2015, Plaintiff started her own tech company, which received several awards.

4

Case 1:23-cv-05381-AMD-SJB  Document 1-3  Filed 07/14/23  Page 6 of 51 PageID #: 16

18.     After earning her Master's Degree, Plaintiff worked at Intel Corp. as an Applications Developer for about two years.

19.     In all of these roles, Plaintiff gained valuable experience in software engineering and performed her job well.

### Plaintiff Is Concerned About Sexism at Defendant Uber

20.     In or around April 2017, after two years of post-Master's Degree software engineering experience, Plaintiff began interviewing for Senior Engineer 2 roles at various companies, including Defendant Uber.

21.     As part of its extensive interview process, Plaintiff interviewed with Defendant Nagarajan, and Defendant Uber managers Will Wang ("Manager Wang"), Peng Zhai, and Nitin Joshi ("Manager Joshi").

22.     The interview process required several rounds of live coding, explaining architecture, and career goals. Plaintiff displayed the vast experience she had gained in her years working as a software engineer and distinguished herself as a highly-qualified candidate for a more senior role. She was praised by the Defendant Uber managers who participated in her interview.

23.     Plaintiff was concerned about Defendant Uber's reputation for sex discrimination and failure to take complaints about sexual harassment seriously. These complaints achieved national notice due to a February 19, 2017, article by Susan Fowler, entitled, "Reflection On One Very, Very Strange Year at Uber." Fowler describes rampant sexual harassment and discrimination, and a human resources function that refused to investigate or punish the harassers.

24.     Plaintiff discussed her concerns with human resources chief Liane Hornsey ("HR Chief Hornsey"). HR Chief Hornsey assured Plaintiff that the misogyny described in Susan

5

Fowler's article was isolated to the specific team on which Fowler worked. Others at Defendant Uber echoed this sentiment.

25.     On July 10, 2018, HR Chief Hornsey was forced to step down from her role due to outrage over her failure to investigate race discrimination complaints and otherwise take them seriously.

**Plaintiff is Offered A Job at Defendant Uber**

26.     On or around April 21, 2017, Recruiter Patrick Burke ("Recruiter Burke") called Plaintiff and informed her that Defendant Uber was offering her a position. Plaintiff was elated-until she learned that Defendant Uber was offering her an entry level role of "Software Engineer 1," a position that is typically filled by recent college graduates with little to no experience.

27.     Plaintiff expressed confusion, surprise, and unease at being offered the role of Software Engineer 1, instead of Software Engineer 2. After all, she had a Master's Degree, over four years of experience as a software engineer, and had displayed--and been praised for--her knowledge and skill. Plaintiff added that other companies she interviewed at offered her positions as a Software Engineer 2.

28.     In response, Recruiter Burke agreed with Plaintiff that she was qualified to be a Software Engineer 2, but convinced Plaintiff it was normal for Uber to hire someone as a Software Engineer 1 and then quickly promote the person; essentially that it was a formality and she would be promoted in less than six months. Plaintiff made it clear that she wanted to work independently on complex assignments, and Recruiter Burke assured her that she would.

29.     Recruiter Burke further assured Plaintiff that Defendant Uber wanted to "set [her] up for success." He stated that she would make more in her bonus as a high-achieving Software Engineer 1 than she would as an average Software Engineer 2.

6

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 8 of 51 PageID #: 18

30.     Recruiter Burke encouraged Plaintiff to speak with various managers at Defendant Uber so she could decide what team she would like to work on. Plaintiff told Recruiter Burke that she wanted to work for Manager Fei's Logistics team. Yet her offer letter stated that she was assigned to Defendant Nagarajan's team. Recruiter Burke represented that the manager's name on her offer letter was a formality, and that the computer system would reflect that she was assignment to Manager Fei's team before her start date.

31.     After she got the offer, Plaintiff discussed her concerns about being placed as a Software Engineer 1 with Defendant Nagarajan and Manager Wang. Both Defendant Nagarajan and Manager Wang assured Plaintiff that she would be promoted to Software Engineer 2 within six months because she had over two years of post-Master's Degree experience.

32.     Manager Wang also told Plaintiff not to worry when choosing a team because transferring is always "on the table" and Plaintiff would not be "locked-in to a single team."

33.     On or around April 25, 2017, Plaintiff received an offer letter from Uber, which she verbally accepted to Recruiter Burke. While she was placed on Defendant Nagarajan's Courier Team, Recruiter Burke assured Plaintiff that she could easily transfer teams later if she preferred a different team. Plaintiff reminded Recruiter Burke that she wanted to work for Manager Fei's Logistics team, and Recruiter Burke reiterated that the offer letter was just a formality, and the computer program would be updated to show that she was assigned to Manager Fei's Logistics team before her start date.

**Plaintiff Begins Work at Defendant Uber**

34.     On June 5, 2017, Plaintiff had her first day working at Defendant Uber. Her Direct Manager was Supervisor Adam Berger ("Supervisor Berger"), who worked under Defendant Nagarajan. Defendant Uber reneged on Recruiter Burke's promise to assign her to Manager Fei's

7

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 9 of 51 PageID #: 19

Logistics team. Plaintiff was to have weekly individual meetings with Supervisor Berger and monthly individual meetings with Defendant Nagarajan.

35.     Plaintiff was also assigned a mentor who was to monitor her work more closely, provide regular feedback and pointers, and help her with onboarding.

**Defendant Nagarajan Sexually Harasses Plaintiff at a Company Retreat**

36.     From July 18 to July 20, 2017, Plaintiff attended a company retreat at Cedar Lakes Estate, New York.

37.     On the final night of the retreat, July 19, 2017, there was a party after dinner where alcohol was provided.

38.     Plaintiff was dancing with her colleagues on the dance floor when Defendant Nagarajan came up to the group and approached her. It was apparent that Defendant Nagarajan was extremely intoxicated; he reeked of alcohol.

39.     Defendant Nagarajan began dancing uncomfortably close to Plaintiff and she immediately moved away. Her facial expression and body language made it clear she was uncomfortable with Defendant Nagarajan's advances and rejected them.

40.     To Plaintiff's extreme disgust, Defendant Nagarajan approached her again and began dancing so close that she felt his sweat on her. Plaintiff left the dance floor as she feared for her safety.

41.     Upon information and belief, Defendant Nagarajan had a reputation for getting extremely drunk at company events and behaving inappropriately.

42.     Plaintiff tried to steer clear of Defendant Nagarajan to avoid further harassment. She feared the sexual harassment would continue at the office.

8

Case 1:23-cv-05381-AMD-SJB Document 1-3 Filed 07/14/23 Page 10 of 51 PageID #: 20

## **Defendant Uber is a Sexist, Male-Dominated Workplace**

43.     Upon her hire, Plaintiff noticed that the vast majority of her team members and colleagues were men. Indeed, Defendant Nagarajan's team had only one other female member.

44.     Of the approximately 100 engineers working in New York City when Plaintiff started at Uber, only 20 were women. As the workforce grew, this gender gap only worsened. Plaintiff was concerned to see the work environment was so male-dominated.

45.     On or around August 4, 2017, Plaintiff received an email from HR Chief Hornsey stating her base salary would increase effective immediately. HR Chief Hornsey explained that Plaintiff was receiving the raise because of an initiative Defendant Uber aimed at ensuring that employees at the same level had salaries "within bands" of each other; which is to say, to rectify unequal pay issues.

46.     Apparently, Plaintiff was not only under-leveled as a Software Engineer 1, but she was underpaid as compared with her male counterparts.

47.     While troubled by this, Plaintiff resolved to work hard towards her goal of a swift promotion to Software Engineer 2, expecting her work product to speak for itself.

## **Plaintiff Excels in Her Role**

48.     Throughout the Summer of 2017, Plaintiff excelled in her role, and received regular praise from her mentor and Supervisor Berger.

49.     In or around August 2017, Plaintiff's mentor changed teams, leaving Plaintiff without a mentor. Plaintiff verbally requested to both Supervisor Berger and Defendant Nagarajan that she be provided a new mentor, but was not given one even though all other new Software Engineers had mentors.

50.     In or around August 2017, Supervisor Berger told Plaintiff they would be having an unofficial performance review. Supervisor Berger praised Plaintiff's work thus far, commending her ability to find and fix bugs in code and collaborate between other teams. He also discussed Plaintiff's desire to be promoted to Software Engineer 2. Plaintiff provided examples to Manager Berger showing how she already met many of the requirements for the role. Manager Berger reiterated to Plaintiff that she was on track for promotion to Software Engineer 2 within six months of her hire, which was the fastest the company could promote her.

### Plaintiff Attends a "Lesbians Who Tech" Summit Representing Defendant Uber

51.     On or around September 9, 2017, Plaintiff volunteered to attend a "Lesbians Who Tech" summit in New York City, representing Defendant Uber, which partially sponsored the event. Plaintiff and other employees of Defendant Uber mentored conference attendees who participated in Defendant Uber's hackathon at the event. Plaintiff's team won.

52.     On or around September 11, 2017, Plaintiff emailed her team to share her experience at the event, as was common practice. Plaintiff explained what she learned about LGBT experiences in the tech industry at the event and at the sessions she attended.

53.     Upon information and belief, Plaintiff's team members, in particular Defendant Nagarajan, perceived Plaintiff to be a lesbian because she attended this event.

### Defendant Nagarajan Takes Over as Plaintiff's Manager and Begins Micromanaging Her and Denigrating her Work

54.     On or around September 18, 2017, Supervisor Adam switched teams, leaving Defendant Nagarajan as Plaintiff's direct supervisor.

55.     Strangely, instead of assigning her a new mentor, Defendant Nagarajan told Plaintiff that he would act as her new mentor, which was unprecedented. Plaintiff was baffled as

10

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 12 of 51 PageID #: 22

an employee's Mentor was supposed to be only one, or in some cases two, levels above the employee, while Defendant Nagarajan was several levels above her and the manager of her team.

56.     Plaintiff feared that Defendant Nagarajan would subject her to more sexual harassment while working more closely with her.

57.     After taking over as her manager, Defendant Nagarajan began micromanaging Plaintiff. Several times in a day, he approached Plaintiff's desk and interrogated her about all of her assignments, repeatedly asking her if she was "stuck." Defendant Nagarajan regularly stated that Plaintiff was somehow not working fast enough on her assignments, even though Plaintiff was working at a similar or faster pace than her peers, and her prior supervisor and mentor never told her she was working too slowly.

58.     By micromanaging Plaintiff in this way, Defendant Nagarajan put enormous pressure on her to work late so she would not appear "stuck" on any of her assignments. Despite the fact that it was normal for Software Engineers to hit roadblocks in their work, Defendant Nagarajan criticized Plaintiff for working too slowly when she hit roadblocks. Plaintiff experienced a great deal of stress and anxiety working hard to avoid Defendant Nagarajan's criticisms.

59.     Plaintiff did not see Defendant Nagarajan micromanage any of his male direct reports. Indeed, it would have been impossible for him to do so with all of his direct reports since he spent so much time micromanaging Plaintiff. Plaintiff observed that most managers at Defendant Uber were far too busy to micromanage their direct reports. Plaintiff was baffled that Defendant Nagarajan wasted so much time every day micromanaging her and denigrating her work.

11

60.     Upon information and belief, Defendant Nagarajan began micromanaging Plaintiff with intention to block her from promotion and set her up for termination because he perceived her to be a lesbian after she attended the "Lesbians Who Tech" summit, and rejected his sexual advances at the Cedar Lake Estates retreat. Upon information and belief, Defendant Nagarajan also targeted Plaintiff out of misogyny; she was one of few women working at Defendant Uber. Finally, upon information and belief, Defendant Nagarajan harassed Plaintiff because of her ethnicity.

61.     To make matters worse, despite claiming he was Plaintiff's mentor, Defendant Nagarajan refused to mentor Plaintiff. Whenever she had questions, Defendant Nagarajan acted like Plaintiff was incompetent and provided no help, telling her to ask someone else. This lack of real mentorship, which everyone in her role was supposed to have, made Plaintiff's work even more difficult, time-intensive, and stressful. With Defendant Nagarajan refusing to help, Plaintiff had to seek guidance from colleagues on other teams to learn what she needed to succeed in her role.

62.     In Fall 2017, Plaintiff started asking if it was possible to change teams so she could work with another manager. Defendant Uber told her that she was forbidden from changing teams until she was with the team for a year. This rule contradicted what Defendant Uber told her during the interview process, but it was apparently a new rule. The rule was so new, in fact, that it did not apply to Plaintiff's previous supervisor and mentor, both white men who transferred teams with less than one year in their positions.

63.     Plaintiff suffered extreme stress and anxiety as a result of Defendant Nagarajan's discriminatory behavior. At the time, Plaintiff was regularly seeing a psychologist for a personal issue, but increasingly began devoting more time in these sessions to deal with the stress coming

from the discrimination she faced at work. In or around late 2017, Plaintiff began devoting the entirety of her therapy sessions to the discriminatory conditions at work.

### **Defendant Nagarajan Escalates the Micromanagement and Unjust Criticism**

64.     On or around October 2, 2017, Plaintiff began weekly individual meetings with Defendant Nagarajan.

65.     At these weekly meetings, Defendant Nagarajan continued to criticize Plaintiff and threatened her job, reminded her that she needed to "earn [her] wage," and that she "gets paid enough," or "gets paid a lot." Upon information and belief, Defendant Nagarajan did not make such comments to his male direct reports.

66.     Defendant Nagarajan continued interrogating Plaintiff several times a day about her progress on her assignments, asking her if she was "stuck," and saying she worked too slowly, even though she was working faster than her male counterparts due to the immense pressure and the number of hours she worked. Defendant Nagarajan did not find any errors in Plaintiff's work, so he just continued to criticize her for not working fast enough.

67.     In or around October 2017, Defendant Nagarajan switched seats in the office with a co-worker who sat next to Plaintiff, telling Plaintiff he wanted to monitor her progress more closely. Plaintiff was shocked by this escalation in his micromanaging behavior. Such an acute level of personal scrutiny was unheard of at Defendant Uber, and it caused Plaintiff significantly more stress and anxiety.

68.     Plaintiff's co-worker expressed confusion as to why Defendant Nagarajan would want to sit next to his direct report, but went along with the switch. Plaintiff's other colleagues also told her they thought the new seating arrangement was "strange."

13

69.     Due to the office's open floor plan, Defendant Nagarajan now had direct view of Plaintiff's laptop at all times while sitting at his desk. Defendant Nagarajan spent about half of his day in meetings and the other half at his desk, from which he closely monitored Plaintiff's work, criticizing her and denigrating her work.

70.     On or around October 19, 2017, Plaintiff took a work from home day for a religious holiday. Despite following company protocol by scheduling the day in advance on the company calendar and reminding her team the day she worked from home, Defendant Nagarajan humiliated Plaintiff by chastising her in a reply-all email to the team for not giving more notice.

71.     Defendant Nagarajan did not publicly chastise Plaintiff's male colleagues, some of whom took work at home days without advanced notice.

72.     After Defendant Nagarajan humiliated her, Plaintiff became afraid to take work from home days to avoid giving Defendant Nagarajan an excuse to publicly chastise her again. Despite this, Plaintiff's male colleagues regularly took work from home days, sometimes for reasons as mundane as package delivery.

73.     On or around October 23, 2017, a female co-worker ("Co-worker One") approached Plaintiff and intimated that she noticed Defendant Nagarajan mistreating Plaintiff. He treated Co-worker One in a similar way since she was first hired. Co-worker One said that Defendant Nagarajan put her on Performance Improvement Plan as a way to try to set her up for her termination, and warned Plaintiff that he may do the same to her.

74.     Upon information and belief, Defendant Nagarajan targeted both Plaintiff and Co-worker One because they were two of the very few women working at Defendant Uber, and further targeted Plaintiff because of her perceived sexual orientation and her rejection of his sexual advances and because of her ethnicity.

75.     On or around November 12, 2017, despite Plaintiff having no real performance issues, Defendant Nagarajan asked Plaintiff to write a daily log of what she accomplished and what she had left to do. Upon information and belief, Defendant Nagarajan did not ask any of his other direct reports to write a daily log of what they did, with whom they met, and what progress they made. The daily log only added work to Plaintiff's day, taking time away from the real work she was doing, and making her days even more stressful and exhausting. The daily log was also unnecessary as Plaintiff already kept track of her tasks and projects using Defendant Uber's project management software.

76.     Due to the intense micromanaging and fear for her job, Plaintiff had to work late every day, most days past 8:00 pm, just to satisfy Defendant Nagarajan's incessant, unfair demands.

**The Discrimination Causes Plaintiff to Experience More Anxiety and Physical Symptoms**

77.     Plaintiff's stress and anxiety only increased as Defendant Nagarajan escalated the micromanagement and she began to fear for her job. She continued regularly discussing the discrimination with her psychologist, looking for ways to healthily handle the stress.

78.     In or around fall 2017, Plaintiff's anxiety which came from the hostile work environment began to manifest in physical symptoms. Plaintiff experienced painful stomach problems and sudden weight gain.

**Management Co-Worker Reports Discrimination to Plaintiff**

79.     In or around 2017, a female co-worker in a management role ("Co-Worker Two") discussed with Plaintiff in confidence her experience at Defendant Uber and the pervasive sexism she faced. Co-Worker Two reported that she, like Plaintiff, was extremely under-leveled upon her hire and placed as a Software Engineer 2, a position requiring around two years of experience, as

15

a software engineer with more than 10 years of experience at the time. Co-Worker Two reported that she made less than some of the men that she managed.

80.     Upon information and belief, Co-Worker Two's situation is not an isolated event, and women earn less than similarly-situated men at Defendant Uber.

81.     Co-Worker Two intimated that male employees constantly questioned her ability and authority simply because she is a woman. Plaintiff was appalled to hear this report of discrimination and saw the parallels with her own experience so far. Plaintiff feared for her job and the way sexism at Defendant Uber might hurt her career progression like it had Co-Worker Two.

### **Plaintiff Begins Seeks Treatment for a Physical Disability**

82.     In or around fall 2017, Plaintiff began experiencing elbow and wrist pain. By December 2017, the pain spread to her arms and hands. In January 2018, the pain spread to her shoulders, neck, and back and became increasingly intense. Plaintiff experienced pain doing daily tasks such as driving, cooking, and using her phone.

83.     Plaintiff went to a physical therapist, chiropractor, and neurologist in search of diagnosis and treatment. Eventually, Plaintiff learned that she suffered from nerve damage.

84.     This prompted Plaintiff to seek reasonable accommodations in the form of ergonomic equipment to help alleviate her pain. She was directed to begin a series of Ergonomic Assessments with the IT department, hoping that a new desk set up could alleviate the pain.

85.     The process for Plaintiff to get ergonomic equipment was byzantine and involved ergonomic assessments, approvals from human resources and her manager, purchase orders, and delay. The process for other engineers at Defendant Uber consisted of the engineer's picking out the equipment he wanted and his manager expensing it.

16

Case 1:23-cv-05381-AMD-SJB Document 1-3 Filed 07/14/23 Page 18 of 51 PageID #: 28

86.     After she detailed her problems, and underwent ergonomic assessments, the ergonomics department told Plaintiff that a new seat cushion, mouse, and keyboard could help alleviate some pain. All they would offer her, however, was a spare split keyboard the IT department had on hand.

87.     Defendant Uber did not engage in the interactive process to accommodate Plaintiff's disability. Rather, it gave her the run-around and made her suffer excruciating pain.

**Plaintiff's New Supervisor Ajeet Ganga Joins Defendant Uber,**
**Tells Plaintiff to be more "Bad-Ass"**

88.     In or around late-January 2018, Defendant Ajeet Ganga joined Defendant Uber and became Plaintiff's new direct supervisor. Plaintiff was excited for the opportunity to have a new supervisor and hoped this may put a stop to Defendant Nagarajan's discrimination. She and Defendant Ganga began weekly one-on-one meetings.

89.     At one of their first weekly meetings in or around January or February 2018, Defendant Ganga told Plaintiff, apropos of nothing, that she was "too nice" and that she "needs to be more bad-ass."

90.     Plaintiff was shocked that her supervisor would speak to her in this way when he was supposed to be giving her legitimate, constructive feedback about her performance. Upon information and belief, Defendant Ganga did not make such comments to his male direct reports.

91.     Plaintiff reported this incident to her female colleagues Co-Worker One and another female co-worker ("Co-Worker Three"), who told Plaintiff that Defendant Ganga also told them "weird" things and did not give helpful feedback. Co-Worker Three, who is Black, reported that Defendant Ganga had made racist comments to her and also inappropriate comments about her weight.

17

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 19 of 51 PageID #: 29

**Plaintiff Discloses Her Disability to Defendant Ganga and Requests Help
with Ergonomic Accommodations**

92.    In their weekly meetings, Plaintiff regularly mentioned to Defendant Ganga her struggle with chronic pain and her attempts to find treatment through various doctors. Defendant Ganga expressed basic sympathy for Plaintiff but often quickly changed the topic.

93.    Throughout 2018, Plaintiff told Defendant Ganga about the difficulty she had in getting ergonomic equipment that could help with her pain, when other's managers simply ordered and expensed the equipment. Defendant Ganga regularly brushed Plaintiff off, or occasionally said he would get involved to help, but did not.

**Defendant Nagarajan Gives Plaintiff an Unfairly Critical Performance
Review and Low Bonus, Blocking her Promotion**

94.    On or around March 1, 2018, Plaintiff received her annual "Equity Award Statement" bonus and found that she only received about 47% of the target number she was given upon her hire. Plaintiff was shocked by the low bonus given how hard she was forced to work due to Defendant Nagarajan's micromanaging, and the praise she received from her first manager. Further, when she was hired, Uber assured Plaintiff that she would make a higher bonus as a Software Engineer 1.

95.    On or around March 12, 2018, Plaintiff had her Annual Feedback Performance Review lead by Defendant Nagarajan. Defendant Ganga was also present.

96.    During the review, ignoring her year of extremely hard work for Defendant Uber, Defendant Nagarajan told Plaintiff that she still had to "prove herself" as an engineer. Defendant Nagarajan claimed that Plaintiff took too long on her assignments. Defendant Nagarajan again reminded Plaintiff that she "gets paid a lot" and needs to prove she was "worth the money."

18

97.     Upon information and belief, Defendant Nagarajan did not tell similarly situated male engineers that they "get paid a lot" or that they needed to "prove themselves."

98.     Upon information and belief, Plaintiff was paid less than similarly-situated male employees because of her gender, perceived sexuality, and ethnicity.

99.     Plaintiff was dismayed by these comments, which unfairly denigrated her performance. Further, Plaintiff feared that Defendant Nagarajan's unfair comments would spoil Defendant Ganga's opinion of her.

100.     Plaintiff challenged Defendant Nagarajan's comments, explaining that she had to work on all of her new assignments alone, as her mentor was no longer there to support her work. Plaintiff stated that the projects she took over were often in a poor state prior, and often needed to be completely reworked, which required additional time. Plaintiff reiterated her request for a new mentor to support her on her assignments.

101.     Defendant Nagarajan did not change any of his criticisms, but conceded that he would get Plaintiff a new mentor.

102.     Plaintiff was devastated by the unfair performance review. It was apparent that Defendant Uber would not promote her within six months as initially promised. Moreover, the unfair performance review would discount her chances for promotion throughout her tenure with Uber.

### **Plaintiff Finally Receives a New Mentor who Praises her Performance**

103.     On or around March 13, 2018, a male co-worker ("Co-Worker Four") became Plaintiff's new mentor.

104.     Co-Worker Four worked closely with Plaintiff and reviewed her work firsthand. Co-Worker Four gave Plaintiff helpful pointers, and regularly praised and approved her work.

### Defendant Ganga Harasses Plaintiff to Complete her Work by
### Extremely Arbitrary and Unreasonable Deadlines

105.    Shortly after Defendant Ganga was hired, he began putting immense pressure on Plaintiff to complete her work on an unrealistic timeframe.

106.    When Plaintiff was assigned a new project, she determined a realistic estimate of the soonest date it could be completed. She and Co-Worker Four regularly conferred on her estimates and Co-Worker Four approved her deadlines. Plaintiff also created documents outlining the architecture of her projects, detailing how long each task would take to justify her deadlines.

107.    When Plaintiff communicated these deadlines to Defendant Ganga, and provided her documentation, however, he would tell her to complete her work faster. He insisted on shorter deadlines even for highly complex projects that depended on multiple other employees and other teams. Defendant Ganga came up with new, arbitrary deadlines for Plaintiff, without any justification or explanation of how the work could be completed more quickly.

108.    Defendant Ganga refused to accept Plaintiff's documentation, endlessly questioned her judgment, and ordered her to justify his arbitrary, new deadlines. Often, Defendant Ganga would only accept Plaintiff's deadline if Co-Worker Four or another male colleague told him he agreed with Plaintiff. Plaintiff continued having to work extremely late, most days until 8 pm, just to satisfy Defendant Ganga's incessant demands for quick turnaround. Plaintiff was so scared for her job that she often worked well into the night, arriving home after midnight, just to meet Defendant Ganga's arbitrary deadlines.

109.    Defendant Ganga was not above abusing his authority. Sometimes he told Plaintiff to complete complex, long-term projects one day earlier than his arbitrary deadline, other times he would tell her to finish a project weeks earlier. Upon information and belief, he did all this

20

nitpicking to gaslight Plaintiff to make her think she was incompetent, and to make her appear incompetent.

110.    Upon information and belief, Defendant Ganga targeted and harassed Plaintiff because he did not think she belonged at Defendant Uber because she is a woman, and because of her ethnicity. Defendant Ganga's harassment only added to Plaintiff's stress and anxiety at work.

**Plaintiff Releases Gender-Based Disparate Treatment and
Equal Pay Claims Occurring on or Before April 19, 2018 But Uber
Continues its Pattern and Practice of Discrimination Thereafter**

111.    Plaintiff participated in the settlement of the class action captioned *del Toro Lopez v. Uber Technologies, Inc.*, Case No. 4:17-cv-06255 (N.D. Cal.), and, therefore, released her claims for (i) unequal pay, (ii) disparate treatment gender, race, and national origin discrimination, (iii) disparate treatment gender, race, and national origin discrimination, and (iv) gender, race, and national origin harassment, as of April 19, 2018. Critically, the claims released by the settlement were "limited to the facts and circumstances pled in the Complaint and [did] not include claims for, among other things, disability discrimination, retaliation, or wrongful discharge." Notwithstanding this limited release, Defendant Uber continued its pattern and practice of discriminating against Plaintiff because of her gender, ethnicity, disability, and perceived sexuality long after April 19, 2018.

**Defendant Ganga Pressures Plaintiff to Work
While She Takes Time Off For Her Health**

112.    In or around the beginning of April 2018, Plaintiff scheduled time off for the week of April 23-28, 2018. Plaintiff was struggling with chronic pain, which had worsened and become debilitating at times. Plaintiff also continued suffering from stomach problems and rapid weight gain due to the anxiety from the discrimination she suffered at work. Defendant Ganga approved the time off for Plaintiff to manage her chronic pain.

21

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 23 of 51 PageID #: 33

113.     At the time, Plaintiff was working on a large, complicated project. Plaintiff and Co-Worker Four agreed that a reasonable deadline for the project was around mid-May, and Plaintiff communicated this to Defendant Ganga. Defendant Ganga initially disagreed with Plaintiff's deadline, until Co-Worker Four and other male engineers told Defendant Ganga they agreed with it. Then, Defendant Ganga accepted Plaintiff's deadline.

114.     Plaintiff's chronic pain was no secret. Throughout early 2018, Plaintiff mentioned her struggle with chronic pain in her weekly one-on-one meetings with Defendant Ganga. Plaintiff frequently iced her arms or shoulders for relief while she worked. Defendant Ganga even asked her why she was icing her arms or commented on marks on her arms from cupping therapy. In reply, Plaintiff described her continuing struggles with chronic pain.

115.     In the week before Plaintiff's scheduled time off, despite knowing of Plaintiff's physical disability and her reason for taking time off, Defendant Ganga told Plaintiff that he needed a project finished by the end of the month.

116.     Remembering her negative performance review, Plaintiff felt immense pressure to finish the project by month's end, before the agreed upon deadline, to avoid criticism and repercussions on her job. Plaintiff was thus forced to work during her time off, despite struggling with the increasing pain.

117.     A few days into her planned time off, Co-Worker Four contacted Plaintiff and told her that Defendant Ganga's deadline was unreasonable, and that he would talk to Defendant Ganga about the deadline. Co-Worker Four said that she should stop working and use the scheduled time off to take care of her health. Plaintiff stopped working for the short remainder of her time off, the whole time fearing for her job and the criticism she would face upon returning to work, merely for taking time to deal with her disability.

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 24 of 51 PageID #: 34

118.    Upon information and belief, Plaintiff's male colleagues took four or more weeks of vacation each year and were not pressured to work during this time. Plaintiff, by contrast, spent her April 2018 vacation sick with the flu and working, when she was supposed to be resting to better manage her chronic pain.

### Defendant Ganga and Defendant Nagarajan Blatantly Favor Plaintiff's White, Male Colleague Over Her

119.    During the first several months of 2018, Plaintiff noticed a stark difference in how Defendant Uber treated her, as compared with her male colleague Alex McGourty ("Co-worker McGourty").

120.    While Defendant Ganga and Defendant Nagarajan constantly pressured Plaintiff to work additional hours, Co-worker McGourty regularly showed up late to work and left early without being reprimanded. While Plaintiff Defendant Ganga and Defendant Nagarajan unfairly questioned and criticized her work product, Co-worker McGourty was not reprimanded even though he had problems implementing several of his projects.

121.    Moreover, Plaintiff and Co-worker McGourty were working in the same position even though, upon information and belief, Plaintiff had more work experience.

122.    In one instance in or around early 2018, Plaintiff had nearly finished implementing a project she had drafted out and planned for herself. Suddenly, Defendant Nagarajan told her to talk to Co-worker McGourty and completely redo the project to incorporate some of Co-worker McGourty's work, which did not have the necessary functionality. Consequently, Plaintiff was forced to go back and complete the project the original way. This exercise created a great amount of extra work for Plaintiff.

123.    Upon information and belief, Defendant Ganga and Defendant Nagarajan treated Co-worker McGourty more favorably and were more lenient with him because he is a white male.

23

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 25 of 51 PageID #: 35

**Defendant Nagarajan's Team is Moved to California,
and all of Plaintiff's Female Colleagues Leave the Team**

124.    In or around May 2018, Defendant Nagarajan's Courier team (which included Defendant Ganga's Courier Experience team) was transferred from New York City to San Francisco. Most team members were given the choice to either relocate to San Francisco or transition to the Restaurant team that was being moved to New York City.

125.    All three of Plaintiff's female colleagues took this as an opportunity to leave the company or transfer out of Defendant Nagarajan's team. Plaintiff's female colleagues expressed to her that they could not succeed under Defendant Nagarajan and Defendant Ganga due to their misogyny and were happy to have the opportunity to leave.

126.    Plaintiff, however, did not have the choice to leave Defendant Nagarajan's team because her skills as a back-end engineer were needed on Defendant Nagarajan's team. Thus, Plaintiff was left as the only woman on Defendant Ganga's team.

127.    Plaintiff continued to work extremely hard in her role, to the regular praise of Co-Worker Four. Despite Defendant Ganga constantly pressuring Plaintiff with unreasonable deadlines, at a one-on-one meeting in or around late-June 2018, he conceded that Plaintiff was "growing substantially."

**Plaintiff Speaks With Manager Joshi About Transferring to His Team**

128.    On or around July 4, 2018, Plaintiff met with the Manager of the Uber Health engineering team, Manager Joshi, to express her interest in transferring to Manager Joshi's team. Manager Joshi told Plaintiff the transfer should be "straightforward," but that he would need to speak to Defendant Nagarajan and Defendant Ganga.

129.    Upon information and belief, Plaintiff's supervisors realized that they had very high turnover for women on the Courier team, and decided that it would look better for them to either

24

push Plaintiff out of the company, or prevent her from transferring by placing her on a performance improvement plan.

### Defendant Ganga Tells Plaintiff She Does Not Belong at Defendant Uber and Puts Her on a Discriminatory Performance Improvement Plan

130.    On or around July 5, 2018, Plaintiff had a meeting with Defendant Ganga. From the onset of the meeting, Defendant Ganga was visibly irritated and talked to Plaintiff in a condescending tone.

131.    In regards to Plaintiff's performance, Defendant Ganga said that asking her to be an engineer at Defendant Uber was the same as asking "a shark to climb a tree" and she needed to be a "monkey" to succeed at Defendant Uber, referencing the derogatory term "code monkey" used for an inexperienced programmer. Defendant Ganga repeated to Plaintiff that she was a "shark," while the engineers at Defendant Uber were "monkeys."

132.    Plaintiff, the only woman on Defendant Ganga's team, was demeaned and offended to be told she was somehow fundamentally different from her male counterparts and unable to perform her job like they did. Upon information and belief, Defendant Ganga viewed Plaintiff as less valuable of an engineer because she is a woman.

133.    Defendant Ganga continued his sexist recitation, stating that Plaintiff's "skills don't match" what Defendant Uber needs and she should pursue a career elsewhere, as something other than an engineer, where she could find a "match for her skills."

134.    Plaintiff asked Defendant Ganga to specify the skills to which he referred, but he refused to answer.

135.    Instead, Defendant Ganga stated that Plaintiff "[doesn't] belong at Uber" and that she should not have been hired because Defendant Uber "only hires the best."

136.    Plaintiff was flummoxed by Defendant Ganga's harsh criticism and blatant sexism, and insisted that Defendant Ganga provide her with specifics examples to back up his criticisms.

137.    Defendant Ganga explained that Plaintiff was "burned out" because she "keeps taking time off." Of course, Plaintiff took time off to address her disability, so her "burned out" status was code for her status as a person with a disability. Upon information and belief, Defendant Ganga valued Plaintiff less as an employee because she was disabled and he perceived her as having a disability.

138.    Plaintiff reminded Defendant Ganga what she had been telling him since he started as her manager: that she suffered from constant pain that felt debilitating at times and was seeking treatment, which was what the time off was for. Plaintiff further explained that the time off she took recently was either approved by Defendant Ganga himself or approved by Defendant Nagarajan before Defendant Ganga's hire. Defendant Ganga responded that he would "consider" her explanation, of which he had already been informed.

139.    Defendant Ganga told Plaintiff that she needed to start working "at 110%" and "regularly working nights and weekends," implying that she should not take any more medical leaves. Notwithstanding that, Plaintiff already worked nights and took very little time off as compared with her peers.

140.    Defendant Ganga warned Plaintiff that if she did not comply she would have to either "quit or get fired." He told Plaintiff that if she decided to remain at the company he would place her on a Performance Improvement Plan (PIP) to monitor her performance. Plaintiff, overwhelmed by the blatant gender and disability discrimination and threats to her job, told Defendant Ganga she needed to think things over and left the meeting.

26

**Plaintiff asks for Defendant Ganga and Defendant Nagarajan's Approval for her Transfer**

141.    On or around July 6, 2018, Plaintiff met briefly with Defendant Nagarajan to discuss her transfer to Manager Joshi's Uber Health team. Plaintiff explained that the Uber Health team aligned closely with her interests and qualifications. Defendant Nagarajan was generally supportive of the idea and reiterated what Plaintiff had heard from various managers at Defendant Uber: that "transfers happen all the time" and "it's not a big deal."

142.    That same day, Plaintiff met with Defendant Ganga regarding the transfer. Plaintiff opened the meeting saying she was very surprised by Defendant Ganga's comments at their last meeting, especially since he previously told her she was "growing substantially." Defendant Ganga replied that Plaintiff was not growing "fast enough."

143.    Plaintiff explained her interest in the transfer, saying that her skillset was more aligned with Manager Joshi's team, and that she could succeed better there. Trying to productively engage with Defendant Ganga's prior comments about her performance, Plaintiff explained that her background was in health and medicine related technology, so Uber Health would be a better match for her and her skillset than her current team.

144.    Defendant Ganga grimaced and told Plaintiff that she could not transfer because she was on a PIP. Confused, Plaintiff replied that Defendant Nagarajan supported the transfer. Defendant Ganga quickly ended the meeting and walked away.

**Defendant Ganga and Defendant Nagarajan Block Plaintiff from Transferring**

145.    Upon information and belief, Defendant Ganga knew it would look bad for him if all of the women and disabled persons formerly on his team transferred to different teams, so he put Plaintiff on a PIP to prevent her from transferring.

27

146.    That same day on or around July 6, 2018, Defendant Nagarajan messaged Plaintiff on the workplace internal chat system and told her he would be meeting with Manager Joshi and Defendant Ganga to discuss her transfer. Defendant Nagarajan told Plaintiff he wanted to speak to Manager Joshi about some "concerns" he had about the transfer due to Plaintiff's "gaps in performance."

147.    Upon information and belief, Defendant Ganga and Defendant Nagarajan badmouthed Plaintiff to Manager Joshi in an attempt to prevent her transfer and/or push her out of the company due to her gender, perceived sexual orientation, disability status, and ethnicity.

**Plaintiff Reports Discrimination to HR and Asks for Help With Her Team Transfer**

148.    On or around July 10, 2018, Plaintiff emailed HR Representative Sheethal Katti ("HR Katti"), asking to meet to discuss Plaintiff's desired transfer. They met on or around July 12, 2018.

149.    Plaintiff told HR Katti that she had been experiencing extreme pain in her back, arms, hands, elbows, and wrists, and was seeking treatment with doctors. She detailed how she hoped to alleviate the pain through ergonomic accommodations with the IT department, but that IT was making the process incredibly complicated and was resistant to getting her the equipment she needed. Plaintiff also discussed how Defendant Ganga was making it incredibly hard for her to get accommodations or take time off for her disability.

150.    HR Katti briefly told Plaintiff she would send her forms for FMLA but did not offer any other help for Plaintiff seeking accommodations.

151.    Plaintiff then inquired about the process to switch teams and explained that her skillset matched that required on the Uber Health team.

152.     HR Katti probed Plaintiff for the reason behind her desire to transfer and assured Plaintiff that their conversation would be confidential. Plaintiff explained how she felt targeted by Defendant Ganga for placing her on a PIP. Plaintiff asked for help getting a team transfer to Manager Joshi's team where she could be free from the discrimination and hostile work environment.

153.     Plaintiff also reported Defendant Ganga's comment about her being a "shark" and him saying that she did not belong at Defendant Uber because she was not a "monkey". Plaintiff began to tear up as she recounted the mistreatment.

154.     HR Katti briefly attempted to console Plaintiff, but said she had to leave for another meeting.

155.     After their conversation, Plaintiff learned that HR Katti met with Defendant Ganga and Defendant Nagarajan to tell them Plaintiff complained.

### Defendant Nagarajan Tells Plaintiff Defendant Ganga Cannot Properly Supervise Her Because Plaintiff is "Emotional"

156.     Later, on or around July 13, 2018, Plaintiff had a scheduled one-on-one with Defendant Nagarajan. Plaintiff brought up how shocked she was by Defendant Ganga's sudden disapproval of her work and the PIP. Defendant Nagarajan told Plaintiff that Defendant Ganga had been withholding his feedback because Plaintiff is "emotional" and he did not want to deal with her potential reaction.

157.     Plaintiff was disgusted that her direct supervisor did not do his job when it came to giving her real, helpful feedback because he considered her "emotional." Upon information and belief, Defendant Ganga is not comfortable working with women because he thinks they are too "emotional."

29

Case 1:23-cv-05381-AMD-SJB Document 1-3 Filed 07/14/23 Page 31 of 51 PageID #: 41

158.    Defendant Nagarajan said that he knew about Plaintiff's report to HR because HR Katti spoke to him and Defendant Ganga about it the day prior. Despite promising confidentiality, HR Katti discussed her report of discrimination with the discriminators. HR Katti also did so without first conferring with Plaintiff which is, upon information and belief, a violation of Defendant Uber's HR policy.

159.    Upon information and belief, Defendant Nagarajan, Defendant Ganga, and HR Katti had met to discuss how best to quash Plaintiff's complaints of discrimination.

160.    Defendant Nagarajan then told Plaintiff that she would not be put on a PIP, but she would be given a new project on which she would be monitored closely before she could transfer – essentially the same structure as a PIP. Defendant Nagarajan called it a "Structured Feedback Action Plan" ("SFP"), which was functionally the same as a PIP, and did not explain how it was different from a PIP nor provide any specific details of what it would look like. Upon information and belief, this was done as per HR Katti's directive as she thought an official PIP was too blatantly discriminatory and retaliatory since Plaintiff's supervisors clearly could not name any concrete performance gaps she had.

161.    Plaintiff felt hopeless and demoralized knowing that her supervisors would do anything to invent problems in her performance and prevent her from transferring or succeeding at the company. Plaintiff began applying to and interviewing for other jobs.

**Defendant Ganga Begins Retaliating Against Plaintiff**

162.    In or around July 2018, after Plaintiff reported discrimination to HR, Defendant Ganga began acting increasingly hostile towards her.

163.    Defendant Ganga ignored Plaintiff's emails, even when they pertained to important, time-sensitive matters. Defendant Ganga cancelled and moved one-on-one meetings with Plaintiff

30

Case 1:23-cv-05381-AMD-SJB Document 1-3 Filed 07/14/23 Page 32 of 51 PageID #: 42

in a further attempt to freeze her out. When Plaintiff tried to inquire about her next assignments, Defendant Ganga vaguely told her he was going to give her tasks but did not tell her what they were and never followed up with her.

164.    This made it incredibly difficult for Plaintiff to do her job, and she was forced to ask Co-Worker Four to talk to Defendant Ganga on her behalf about her tasks and assignments.

165.    Upon information and belief, Defendant Ganga viewed Plaintiff as a "troublemaker" because she complained of discrimination and was retaliating against her for doing so.

166.    Despite telling Plaintiff she was being put on a "SFP," Defendant Ganga never sent her any information about what her SFP would entail.

**Co-Worker Four Gives Plaintiff Positive Feedback and is Shocked to Hear About the PIP**

167.    On or around July 12, 2018, Plaintiff spoke to Co-Worker Four and asked for feedback on her performance.

168.    Co-Worker Four told Plaintiff she was doing very well and, consistent with his job as her mentor, gave her some minor pointers to improve her work even further.

169.    Co-Worker Four told Plaintiff he wanted to help her get promoted to Senior Engineer, which was a level above Software Engineer 2. Plaintiff reminded Co-Worker Four that she was not even a Software Engineer 2 yet, but a Software Engineer 1. Co-Worker Four was surprised, as there was no noticeable difference between the work she was doing and that of a Software Engineer 2.

170.    Co-Worker Four was confused when Plaintiff told him that Defendant Ganga wanted to put her on a PIP. He added that it sounded "unnecessary" for an employee performing as well as she.

## **Plaintiff Discusses the Discrimination with her Colleagues**

171.    On or around July 17, 2018, Plaintiff spoke with Co-worker Two and others about the gender and disability discrimination to which she was being subjected, including the PIP which prevented her from transferring to a new team.

172.    Plaintiff's co-workers were horrified by the blatant discrimination, and advised her to talk to higher-ups at Defendant Uber, such as Defendant Nagarajan's boss Manager Chris Hasemen ("Manager Hasemen") and Chief Diversity Officer Bo Young Lee ("Chief Diversity Officer Lee").

173.    Plaintiff took their advice and scheduled meetings with both individuals, hoping to put a stop to the discrimination and secure a transfer to Manager Joshi's team.

## **Plaintiff Reports Discrimination to Manager Hasemen and Chief Diversity Officer Lee**

174.    On or around July 19, 2018, Plaintiff met with Manager Hasemen and described the discrimination she was facing from Defendant Ganga and Defendant Nagarajan. Plaintiff reported being unfairly micromanaged by Defendant Ganga and Defendant Nagarajan, being told she does not belong at Defendant Uber, that her requests for reasonable accommodations for a disability were being used against her, and the discriminatory PIP which prevented her transfer to a different team where she could excel.

175.    Manager Hasemen told Plaintiff that her situation sounded "serious" and that he was going to do some "investigation." Upon information and belief, Manager Hasemen did not do any investigation into Plaintiff's claims, but instead he warned Defendant Nagarajan that Plaintiff had complained about him. Upon information and belief, Manager Hasemen and Defendant Nagarajan are close personal friends.

176.    The next day, on or around July 20, 2018, Plaintiff met with Chief Diversity Officer Lee. Plaintiff again reported the gender and disability discrimination she faced at the hands of Defendant Ganga and Defendant Nagarajan. Chief Diversity Officer Lee was visibly appalled when Plaintiff relayed Defendant Ganga's explanation that she, as an engineer, was a like a "shark climbing a tree" and that she needed to be a "monkey." Chief Diversity Officer Lee told Plaintiff to contact Employee Relations.

177.    Plaintiff also reported that HR Katti spoke to Defendant Nagarajan and Defendant Ganga about Plaintiff's report of discrimination before speaking with Plaintiff. Chief Diversity Officer Lee appeared surprised and told Plaintiff that was against company policy.

178.    As she relayed the terrible discrimination that happened to her, Plaintiff began to cry, struggling to maintain her composure.

179.    Chief Diversity Officer Lee asked Plaintiff what she hoped to get out of this meeting. Plaintiff replied that she wanted a team transfer so she could be free from the discrimination.

180.    Chief Diversity Officer Lee said she would work on getting Plaintiff the transfer approval and asked Plaintiff in the meantime to send her any emails or anything in writing pertaining to her complaints. Plaintiff sent Chief Diversity Officer Lee her written notes from meetings with Defendant Nagarajan and Defendant Ganga.

181.    A few hours after the meeting, Chief Diversity Officer Lee emailed Plaintiff and told her the transfer would be approved, but that she was still figuring out what to do about the PIP.

33

Case 1:23-cv-05381-AMD-SJB Document 1-3 Filed 07/14/23 Page 35 of 51 PageID #: 45

## **Plaintiff Begins a "Structured Feedback Action Plan"**

182. On or around July 20, 2018, Defendant Ganga finally stopped ignoring Plaintiff and set a meeting with her.

183. Defendant Ganga told her the meeting was to discuss the details of her "PIP" and then corrected himself saying it was actually a "Structured Feedback Plan." Throughout the meeting, Defendant Ganga repeatedly referred to the "PIP," and then corrected himself, making it evidently clear the SFP was functionally the same as a PIP. Defendant Ganga told Plaintiff that her project entailed working with two co-workers on a neighboring team, but did not give her any specific details on what she would be doing. Defendant Ganga told her to ask them for more details.

184. During the meeting, Defendant Ganga was visibly apprehensive and kept trying to read Plaintiff's handwritten notes.

185. Plaintiff felt defeated and demoralized that after all of her efforts to end the discrimination she was still being put on a discriminatory PIP, which would make it harder for her to be promoted, and lower her annual bonuses and overall compensation.

186. Still Plaintiff resolved to work hard and keep her head down because she would soon be able to transfer to Manager Joshi's team.

187. Plaintiff performed extremely well on the project, to the praise of her co-workers, as well as Manager Joshi. At no point did Defendant Uber give Plaintiff clear guidelines or criteria for how her performance would be assessed under the PIP/SFP. After completing the project, Manager Joshi told Plaintiff not to worry about SFP at all.

## **Plaintiff Transfers to Manager Joshi's Uber Health Team and Excels**

188. On or around July 24, 2018, Plaintiff officially transferred to Manager Joshi's Uber Health team.

34

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 36 of 51 PageID #: 46

189.    Plaintiff was relieved no longer to be under the supervision of Defendant Nagarajan and Defendant Ganga and set to work onboarding to the new team. From the start, Manager Joshi regularly praised Plaintiff's performance, and told her that he received positive feedback about her from her peers on the team.

190.    Manager Joshi also told Plaintiff he would not include any feedback from her previous managers in her performance reviews. Upon information and belief, Manager Joshi recognized the previous performance reviews and PIP were unjustified and discriminatory.

### HR Investigation Substantiates Some of Plaintiff's Complaints, But Does Not Rectify the Discrimination

191.    On or around August 29, 2018, HR Representative Kitt Shute ("HR Shute") scheduled a Zoom meeting with Plaintiff to discuss the results of the investigation launched after Plaintiff's report of discrimination from July.

192.    HR Shute started the meeting by saying that the investigation found that Plaintiff did have "performance gaps," and so the PIP and discriminatory micromanaging were somehow justified.

193.    Plaintiff asked HR Shute for specific details on what those "performance gaps" were and she could not provide any. When Plaintiff insisted she be given an example, HR Shute claimed that Plaintiff's managers found she was "missing fundamentals."

194.    Plaintiff found this explanation to be implausible. Uber applicants were vetted for their knowledge of fundamentals and would not be hired if any were missing. Indeed, Plaintiff was not hired until she passed an extensive interview process, which included Defendant Nagarajan, where she was assured by multiple Defendant Uber higher-ups that she was being "set up to succeed" in her role. Further, no one on Manager Joshi's team, nor her previous mentors on her former team ever told Plaintiff she was "missing fundamentals."

35

195.    HR Shute told Plaintiff that in the investigation of Plaintiff's complaint of gender and disability discrimination, Defendant Nagarajan and Defendant Ganga were found to be "violating company policy" and they were given "training" as a result.

196.    Plaintiff asked what specific violations the investigation found, and what kind of training they were given. HR Shute said she could not tell Plaintiff this due to "confidentiality." Plaintiff was frustrated and chagrined to hear this. HR representatives had previously shown no respect for her confidentiality when they spoke to her Defendant Nagarajan and Defendant Ganga about her complaint before speaking to her.

197.    When Plaintiff insisted that she be given some information about what the investigation actually found, HR Shute conceded that Defendant Ganga did not properly handle Plaintiff's requests for reasonable accommodations, and that he should have referred her to Defendant Uber's accommodation resources.

198.    Upon information and belief, Defendant Ganga and Defendant Nagarajan faced no serious consequences. Later, in or around mid-2018, and again in early 2020, Defendant Nagarajan received promotions.

199.    The investigation did nothing to address how Plaintiff's compensation was dramatically less than she was promised she would earn as a Software Engineer 1, and what she would be earning if she were hired as, or promoted to Software Engineer 2. The investigation did not change the fact that she was under-leveled due to the discrimination and retaliation.

200.    On the one hand, Plaintiff felt relieved that she was finally on a new team where she could do what she came to Defendant Uber to do without discrimination or harassment. On the other hand, Plaintiff felt incredibly demoralized and devalued by Defendant Uber because they would take no serious action against her discriminators, attempted to justify their behavior,

36

Case 1:23-cv-05381-AMD-SJB Document 1-3 Filed 07/14/23 Page 38 of 51 PageID #: 48

would not rectify her compensation or title, and would not remove the discriminatory PIP and performance reviews from her record.

201.     Defendant Uber's HR department validated Defendant Nagarajan and Defendant Ganga's discrimination. Consequently, Plaintiff still had to fight an uphill battle to succeed at Defendant Uber due to her gender, perceived sexual orientation, status as a disabled person, and ethnicity.

### Chief Diversity Officer Lee Tells Plaintiff She Should "Not Have Emotions" in Response to Discrimination

202.     In or around September 2018, Chief Diversity Officer Lee scheduled a meeting with Plaintiff to follow up on her on the transfer.

203.     They started by discussing how Plaintiff was adjusting to working on Manager Joshi's team, but the discussion soon took an unexpected turn.

204.     Diversity Officer Lee told Plaintiff: "women fall into two categories when they get upset – those who get angry and those who get sad. You get sad." She added, that "as a woman," Plaintiff should "not have emotions, or have emotions before meetings."

205.     Upon information and belief, by telling Plaintiff to "not have emotions," she was telling Plaintiff to not object, or even react, to discrimination and retaliation in the workplace.

206.     Plaintiff was disgusted by the sexist stereotyping used by the female Chief Diversity Officer. It was apparently Chief Diversity Officer Lee's tone-deaf philosophy that to succeed in a male-dominated, gender discriminatory workplace such as Defendant Uber, she should enforce the sexist prejudices of her male peers instead of challenging them, as Plaintiff did. Indeed, Chief Diversity Officer Lee was suspended from her role in May 2023 for championing a tone-deaf program on how racial discrimination affects white women.

207. Upon information and belief, Defendant Ganga and Defendant Nagarajan told Chief Diversity Officer Lee that Plaintiff was "too emotional" during the investigation into their discrimination, retaliation, and harassment against Plaintiff.

208. Plaintiff continued discussing with her therapist Defendant Uber's terrible response to her complaints of discrimination and used her therapist as a resource to deal with the tremendous stress and anxiety caused by Defendant Uber's failure to address the discrimination and retaliation.

### HR Again Ignores the Discrimination, Claiming Plaintiff had Unnamed Performance Issues

209. On or around October 4, 2018, HR Representative Chapin Hertel ("HR Hertel") emailed Plaintiff informing her that HR Shute had left Defendant Uber and she was now in charge of her complaint. HR Hertel reiterated that the investigation found that Defendant Ganga failed to properly address her requests for disability accommodations, but did not provide any other findings. HR Hertel also reiterated that he could not say who Defendant Uber spoke to about her performance gaps due to "confidentiality." Upon information and belief, HR simply took Defendant Nagarajan and Defendant Ganga at their word concerning the fabricated performance gaps.

210. Plaintiff remained incredibly frustrated that HR continued to validate the discrimination of her former managers, which was still hurting her career progression at Defendant Uber.

211. On or around October 11, 2018, Plaintiff replied to HR Hertel asking if HR would do anything about the sexist comments she endured from her previous managers. Plaintiff also pointed out that her first manager, Manager Berger, did not have negative things to say about her performance, and neither did her peers.

38

212.    Plaintiff again asked for clarification about specific performance issues that the investigation supposedly found. She also asked if HR would be rectifying the effect the discrimination had on her career progression and compensation.

213.    Defendant Uber did not reply to Plaintiff's email.

### Plaintiff Excels Under Her New Manager, But is still Held Back by Past Negative Performance Reviews and the PIP

214.    On or around October 24, 2018, Manager Joshi held a performance review with Plaintiff. He explained that since Plaintiff had been on his team for fewer than six months, he did not have enough data to put her up for a promotion. If he did, Defendant Uber's promotion committee would look at Defendant Nagarajan and Defendant Ganga's negative reviews since she was not on Manager Joshi's team long enough.

215.    While happy with the positive feedback, Plaintiff was incredibly upset that, due to Defendant Uber's discrimination and retaliation, in almost two years she had still not received the promotion Defendant Uber assured her would happen within six months from her date of hire.

### Plaintiff Insists HR Rectify the Discrimination, to No Avail

216.    In or about December 2018, after HR Hertel brushed-off another round of emails from Plaintiff, Plaintiff decided to speak to a lawyer from Outten & Golden LLP, an employment discrimination law firm. Plaintiff was incredibly frustrated that she had to resort to outside help to get HR to respond to her emails, but was determined to have the discrimination rectified.

217.    On or around December 21, 2018, Plaintiff had still not heard back from HR Hertel, and followed up again via email. Plaintiff told HR Hertel in the email that she expected a response by January 4, 2019, and asked her lawyer to contact the company as well.

39

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 41 of 51 PageID #: 51

218.    On or around December 27, 2018, Achia Swift from Employee Resources ("ER Swift") responded to an email from Outten & Golden saying Defendant Uber HR would reply by the January 4 deadline.

219.    On or around January 7, 2019, Plaintiff had still not heard back from Defendant Uber. Plaintiff's lawyers followed up with ER Swift asking for a response.

220.    On or around January 14, 2019, ER Swift finally replied to Outten & Golden, saying that HR reviewed the investigation. ER Swift said they concluded that the investigation was done well and there was no unlawful discrimination or harassment.

221.    Throughout 2019, Plaintiff regularly followed up with HR, reiterating her concerns about the discriminatory PIP and negative performance reviews hurting her career progression. HR either ignored her emails or generally restated the results of the investigation with no specific details.

**Plaintiff Excels in her Role**

222.    Throughout 2019, Plaintiff continued to receive positive feedback from her peers and Manager Joshi. On or around March 14, 2019, she received her 2018 compensation statement, and was pleased to see she met her entire cash bonus target.

**Plaintiff is Sexually Harassed by Former
CEO Defendant Travis Kalanick at the Uber IPO Celebration**

223.    On or about May 9, 2019, Uber became a publicly traded company and the entire company was invited to celebrate. Employees at Defendant Uber had constantly bragged leading up to the IPO that they would be a "Unicorn," meaning a company valued at over $1 billion. In fact, Defendant Uber was valued at more than $1 billion.

224.    A celebration occurred at an Irish bar, and included Plaintiff's team members, managers, and various higher-level managers including the previous CEO Defendant Kalanick.

40

225. To celebrate their "Unicorn" IPO Status, Plaintiff wore a unicorn costume over her clothes. To Plaintiff's horror, as she entered the bar Defendant Kalanick approached her and, without warning, grabbed the horn on her costume, made a masturbatory motion on it, smirked at her, and then walked away.

226. Plaintiff felt humiliated and disgusted. As she looked around, she saw her team members looking at her with shock and concern. Several of her colleagues approached her to ask her if she was okay and express their disgust with Defendant Kalanick.

227. Plaintiff felt demoralized that the misogynist, male-dominated culture at Defendant Uber continued to perpetuate blatant discrimination and sexual harassment even as the company was being sued in a class action for gender discrimination.

## Plaintiff is Finally Promoted to Software Engineer 2

228. After continued excellent performance, on or around September 4, 2019, Plaintiff was finally promoted to Software Engineer 2. Plaintiff worked hard in this new role to the praise of her managers and colleagues.

229. While excited to move into the new position, Plaintiff was still frustrated that her promotion had taken so long due to Defendant Nagarajan's and Defendant Ganga's discrimination. Many of Plaintiff's colleagues who started around the same time as her with similar experience were being promoted to managers already, making significantly more money than she.

230. Plaintiff continued to worry that the past negative performance reviews and PIP would count against her for future promotions and bonuses, and hurt her career at Defendant Uber.

## Defendant Nagarajan Continues to Encourage Frat-Boy Behavior at Company Events

231. On or around December 5, 2019, Defendant Uber's New York City office held a holiday party. In one section of the party, a ball pit was set up.

41

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 43 of 51 PageID #: 53

232.    At one point, Plaintiff was chatting with several colleagues around the edge of the ball pit when Defendant Nagarajan cannonballed into the ball pit and started a "ball fight" with his male colleagues in the ball pit. Defendant Nagarajan became increasingly rowdy and belligerent, and the fight grew out of control to the point that Plaintiff and a female colleague were both hit in the face with stray plastic balls.

233.    Plaintiff was disgusted by Defendant Nagarajan's behavior and the frat-boy culture he perpetuated at Defendant Uber, and was relieved she was no longer under his supervision.

234.    On or around December 19, 2019, Plaintiff filed an anonymous complaint about Defendant Nagarajan's inappropriate behavior at the company event. Plaintiff received a reply to her complaint that action was taken and, having been exhausted by her attempts to work with HR, she did not pursue the matter any further.

**Defendant Uber Announces Restructuring That
<u>Would Put Plaintiff Working Under Defendant Nagarajan Again</u>**

235.    On or around April 9, 2020, Defendant Uber announced restructuring wherein everyone on Plaintiff's Uber Health team would be transitioned to Defendant Nagarajan's Restaurants team.

236.    Plaintiff was told that due to her position she would report to Manager Berger, who reports to Defendant Nagarajan.

237.    Plaintiff was horrified by the prospect of having to work under the man who sexually harassed her, blatantly discriminated against her, and sabotaged her career at the company.

238.    Shortly after this announcement, Plaintiff spoke with Manager Joshi via a Zoom video call. Plaintiff expressed her serious concerns with working under Defendant Nagarajan again

42

and Manager Joshi said he understood and would contact HR to see if he could get her transferred elsewhere.

239.    In the meantime, Plaintiff struggled with intense anxiety, brain fog, and difficulty functioning caused by the prospect of having to work with her discriminator and harasser once again. Plaintiff, who had finally been able to excel under a competent, supportive manager felt crushed by the news of the restructuring and knowing how little Defendant Uber had done to protect her.

240.    Plaintiff regularly spoke to her therapist about the intense anxiety she was experiencing. Her therapist told her she was having a PTSD response to the thought of returning to the pervasive discriminatory and hostile work environment.

### Plaintiff Meets with HR about Transferring to a Different Team

241.    On or around April 17, 2020, Plaintiff met with HR Representative Jay Miller ("HR Miller") and Director Vivek Gupta. Plaintiff requested that in the restructuring she be moved to a team that does not report to Defendant Nagarajan. HR Miller said he would let her know about various options and ask her input.

242.    On or around April 23, 2020, HR Miller told Plaintiff via email that she was being placed on Senior Engineer Manager Rohan Mathew's ("Manager Mathew") team, even though he had promised Plaintiff that she would have a say in the decision.

243.    When Plaintiff went to speak with Manager Mathew, he blew her off and told her to "just report" to Chamara Paul, who would report to him. This was despite the fact that Plaintiff was supposed to be Manager Matthew's direct report. It was clear that no one at Defendant Uber intended to develop Plaintiff or help her rise among the ranks to where she would have been, but for Defendant Nagarajan's and Defendant Ganga's discrimination, retaliation, and harassment.

43

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 45 of 51 PageID #: 55

244.    Although transferred away from Defendant Nagarajan's reporting line, Plaintiff still experienced extreme anxiety due to a process that made her fear further potential retaliation from Defendant Nagarajan. It had become abundantly clear to Plaintiff that HR did not care if she suffered future discrimination or retaliation. She was exhausted and demoralized by constantly having to fight to be treated equally.

## Plaintiff takes Medical Leave

245.    In or around May 2020, the stress related to work and the threat of working under Defendant Nagarajan caused Plaintiff's mental and physical health issues to intensify. Plaintiff struggled to focus, was overwhelmed by intense feelings of anxiety and panic, and was constantly crying.

246.    Plaintiff continued discussing the problems with her therapist, who recommended she take medical leave to deal with her PTSD symptoms.

247.    On or around May 29, 2020, after she completed her role in an important team-wide project, Plaintiff began her medical leave.

## Plaintiff Returns from Leave and is Constructively Terminated

248.    While on leave, Plaintiff decided she could no longer tolerate the discriminatory, male-dominated environment at Defendant Uber, which had taken an extreme toll on her mental and physical health. Plaintiff was further disillusioned by the fact that her attempts to address and stop the discrimination fell on deaf ears and resulted in retaliation.

249.    As a result of the discrimination and retaliation at Defendant Uber, which harmed her mental and physical health, it was impossible for Plaintiff to continue working for Defendant Uber. She was constructively terminated.

44

250.    Plaintiff returned from leave on or around August 31, 2020, and her last day of
employment was September 15, 2020.

### CLAIMS FOR RELIEF

#### AS AND FOR A FIRST CAUSE OF ACTION
*(Gender, Sexual Orientation, Disability, and Ethnicity Discrimination in Violation of the New
York City Human Rights Law and the New York State Human Rights Law)*
***Against All Defendants***

251.    Plaintiff re-alleges and incorporates by reference each and every allegation in each
and every aforementioned paragraph as if fully set forth herein.

252.    Defendants discriminated against Plaintiff in violation of the NYSHRL and
NYCHRL by subjecting Plaintiff to adverse employment actions on the basis of her status as a
woman. Defendants discriminated against Plaintiff by refusing to provide Plaintiff with reasonable
workplace accommodations, refusing to engage in a cooperative dialogue concerning
accommodations, and wrongfully terminating Plaintiff's employment because of gender,
disabilities, perceived sexuality, and ethnicity.

253.    Defendants further discriminated against Plaintiff by repeatedly refusing her a
promotion that was merited by her work performance.

254.    As a direct and proximate consequence of Defendants' discrimination herein
alleged, Plaintiff has suffered, and continues to suffer, substantial damages, including but not
limited to lost wages, benefits, and other economic loss, severe psychological, mental, physical
and emotional distress, harm to employability and earning capacity, disruption to personal life,
and other compensable damages.

255.    Defendants acted intentionally and with malice and/or reckless indifference to
Plaintiff's State-law protected rights, entitling Plaintiff to punitive damages.

45

256. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of New York State laws, including the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Unequal Pay in Violation of Article 6 of the New York State Equal Pay Act
Labor Law §§ 190, et seq.)*

257. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

258. At all relevant times, Plaintiff was an employee and Defendant Uber was an employer within the meaning of the New York State Equal Pay Act.

259. The acts and practices of Defendant Uber constitute discrimination against Plaintiff in violation of the New York State Equal Pay Act by unlawfully paying female less than male for equal work.

260. Defendant was aware of complaints and requests for investigation made by Plaintiff concerning the unfair pay practices but did not rectify or investigate its unlawful pay practices.

261. Plaintiff's violations of the New York State Equal Pay Act were willful, entitling plaintiff to liquidated damages.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Violation of the Equal Pay Act, 29 U.S.C. 206(d).)*

262. Plaintiff repeats and realleges the allegations contained in the paragraphs above as if separately set forth here.

263. At all relevant times, Plaintiff was an employee and Defendant Uber was an employer within the meaning of the Equal Pay Act.

264. Defendant Uber deliberately, wilfully, and systematically paid Plaintiff substantially less than it paid male employees performing work requiring equal skill, effort, and

46

Case 1:23-cv-05381-AMD-SJB   Document 1-3   Filed 07/14/23   Page 48 of 51 PageID #: 58

responsibility, performed under similar working conditions. Defendant was aware of complaints

and requests for investigation made by Plaintiff concerning the unfair pay practices but did not

rectify or investigate its unlawful pay practices.

265. Plaintiff's violation of the Equal Pay Act was willful.

266. As a result of the foregoing, Plaintiff has suffered monetary damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
*(Retaliation in Violation of the New York City Human Rights Law
and the New York State Human Rights Law)*
***Against All Defendants***

267. Plaintiff repeats and realleges the allegations contained in the paragraphs above as

if separately set forth here.

268. Plaintiff was an employee of Defendants and is protected by the NYSHRL and

NYCHRL from retaliation and retaliatory discharge.

269. Plaintiff complained to Defendants about the gender and disability discrimination

to which she was subjected during her employment with Defendants.

270. Plaintiff's complaints were ignored by Defendants.

271. Defendants, unlawfully and without cause, retaliated against Plaintiff and/or aided

and abetted retaliation against her as a direct result of Plaintiff's complaining about the incidents

of gender and disability discrimination.

272. Because she protested Defendants' unlawful behavior, Plaintiff was subjected to

retaliation.

273. The retaliation substantially interfered with the employment of Plaintiff and

created an intimidating, offensive, and hostile work environment in violation of the NYSHRL

and NYCHRL, and ultimately resulted in her constructive termination. Defendants knew and

should have known about the retaliation and the effect it had on Plaintiff's employment and

failed to take any action to stop the retaliatory conduct.

274.     As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to, wages and other benefits due her.

275.     Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, great humiliation, and physical assault, which have manifested in serious emotional distress.

276.     As a further direct and proximate result of said unlawful employment practices and retaliation, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

277.     As a result of Defendants' violation of the NYSHRL and NYCHRL, Plaintiff has been damaged in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
*(Aiding and Abetting Discrimination in Violation of the New York State Human Rights Law)*
***Against the Individual Defendants***

278.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

279.     Defendants acted to aid and abet the discrimination and retaliation complained of herein, in violation of the NYSHRL.

48

280. As a direct and proximate result of Defendants' discrimination, Plaintiff has suffered and continues to suffer damages including loss of pay and benefits, severe mental anguish and emotional distress, and damage to her physical health.

281. Defendants acted intentionally and with malice and/or reckless indifference to Plaintiff's state-law protected rights, entitling Plaintiff to punitive damages.

282. Plaintiff will continue to suffer these damages and until the Court grants all of the relief which she is entitled that is requested herein.

283. By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for these violations of law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

i. On Plaintiff's First Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $2,500,000.00.

ii. On Plaintiff's Second Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $2,500,000.00.

iii. On Plaintiff's Third Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $2,500,000.00.

INDEX NO. 711858/2023
RECEIVED NYSCEF: 06/08/2023

iv. On Plaintiff's Fourth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $2,500,000.00.

v. On Plaintiff's Fifth Cause of Action, awarding Plaintiff compensatory and other damages, including punitive damages in an amount to be determined at trial but in any case, no less than $2,500,000.00.

vi. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
June 8, 2023

GODDARD LAW PLLC
*Attorneys for Plaintiff*

By: */s/ Megan S. Goddard*

Megan S. Goddard
Frances Codd Slusarz
39 Broadway, Suite 1540
New York, New York 10006
(646) 964-1178
Megan@goddardlawnyc.com
frances@goddardlawnyc.com

50